**Thomas B. BLUMEL, Sr., Plaintiff,**

v.

**Thomas A. MYLANDER, individually and in his official capacity as [1] Hernando County Sheriff, Hernando County, a political subdivision of the State of Florida, and Corrections Corporation of America, a Tennessee corporation, Defendants.**

No. 95–1534–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 23, 1997.

---

1. The defendant Thomas A. Mylander previously settled this dispute with the plaintiff and has been dismissed as a party from the action.

Christopher M. Shulman, Law Office of Christopher M. Shulman, Tampa, FL, for Thomas B. Blumel, Sr.

F. Scott Pendley, Dean, Ringers, Morgan and Lawton, P.A., Orlando, FL, for Hernando County.

Robin E. Greiwe, Charles J. Thomas, Thompson, Sizemore & Gonzalez, P.A., Tampa, FL, for Corrections Corporation of America.

## ORDER

KOVACHEVICH, Chief Judge.

This cause is before the Court on the following motions, responses, and supporting material:

1. Plaintiff, Thomas B. Blumel, Sr.'s, renewed motion for partial summary judgment, with exhibits attached (Docket No. 63), filed October 29, 1996, memorandum of law in support thereof (Docket No. 70), filed November 25, 1996, and responses thereto (Docket Nos. 65 and 67), filed October 30 and November 15, 1996, respectively.

2. Defendant, Corrections Corporation of America's (hereafter CCA) motion for summary judgment and memorandum of law in support (Docket No. 48), filed October 1, 1996, and response thereto (Docket No. 62), filed October 22, 1996.

3. Defendant, Hernando County's, (hereafter County) cross-motion for summary judgment and memorandum of law in support (Docket No. 65), filed October 30, 1996, and response thereto (Docket No. 68), filed November 19, 1996.

4. The following supporting documents: Depositions of Lawrence T. Brown, Leslie Robert Huffstetler, Jr., and Thomas Bernard Blumel, Sr.; affidavits of the Honorable Peyton B. Hyslop, John Kufner, Edward Bond, Rosemary Whatley, and Daniel LaPlaca; Answers to Interrogatories by CCA and Plaintiff (Docket No. 49–56).

### PROCEDURAL HISTORY

On September 18, 1995, the plaintiff filed a verified complaint alleging that the defendants, County and CCA, violated 42 U.S.C. § 1983 by unconstitutionally depriving him of his liberty without due process. The essence of the complaint was that the defendants violated their constitutional duty to ensure that warrantless pre-trial detainees be detained only after a judicial determination of probable cause within the first forty-eight (48) hours after arrest. Mr. Blumel asserts that he spent approximately thirty (30) days in jail without the requisite judicial determination of probable cause. The complaint also asserted state law claims of false imprisonment and negligence against the defendant CCA, which operated the Hernando County Jail pursuant to contract.

The plaintiff filed a motion for partial summary judgment (Docket No. 17) and the defendant, CCA, filed a motion to dismiss (Docket No. 6). On March 12, 1996, this Court entered an order on those motions. This Court denied both pending motions. The motion for partial summary judgment was found to be premature and was denied without prejudice to refile at a more appropriate time.

On March 20, 1996, the plaintiff filed an amended complaint against the County and the CCA. The complaint contains the following causes of action: violation of 42 U.S.C. § 1983 against both defendants (Count I); false imprisonment against both defendants (Counts II and IV); and negligence against both defendants (Counts III and V). Discovery has concluded and all involved parties have filed motions for summary judgment, which are now to be addressed by the Court.

### STANDARD OF REVIEW

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact, when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 995–97 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Material factual disputes preclude summary judgment.

The Supreme Court of the United States, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), held:

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial. (Id. at 317, 106 S.Ct. at 2549).

The Court stated, "Rule 56(e) therefore requires that non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.,* at 324, 106 S.Ct. at 2553. As the district court in *Coghlan v. H.J. Heinz Co.,* 851 F.Supp 808 (N.D.Tex. 1994), summarized:

> Although a court must "review the facts drawing all inferences most favorable to the party opposing the motion," ... the nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment ... The existence of a mere scintilla of evidence will not suffice ... (cites omitted) at 810–811.

Issues of fact are "'genuine' only if a reasonable jury considering the evidence presented could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### *FACTS*

For purposes of ruling on the pending motions for summary judgment only, the Court finds the following facts to be relevant to the resolution of said motions:

In or about July 1992, Mr. Blumel's second wife Judy left him a note and left the marriage home (Ex. 2, Docket No. 52). Thereafter, on or about July 27, 1992, Mr. Blumel was served with divorce papers (Docket No. 52, pg 71), followed in three (3) days by a restraining order issued by Florida Circuit Judge Richard Tombrink, Jr. (Ex. 3, Docket No. 52). The restraining order stated in pertinent part:

> ORDERED and ADJUDGED that the Respondent, THOMAS B. BLUMEL, is hereby ordered to refrain from molesting, harassing and annoying the Petitioner; ... ORDERED and ADJUDGED that this Court orders any law enforcement officer in the State of Florida, and his deputies to enforce this Restraining Order and in the event the Respondent fails to comply with the terms of this order, the Sheriff's Department is hereby ordered to detain and arrest the Respondent and bring him immediately before the Circuit Court, it is further
>
> ORDERED and ADJUDGED that any and all law enforcement officers are directed and ordered to enforce this Restraining Order for protection. If the aforesaid law enforcement officers find the Respondent about or near the Petitioner and said officers have probably (sic) cause to believe that the Respondent has violated the terms and conditions of this Restraining Order, they shall immediately take the Respondent into custody and bring him *forthwith before this Court* to show cause why he should not be held in contempt for violating this Court's order ... (Ex. 3, Docket No. 52) (emphasis added).

On September 8, 1996, Judge Tombrink entered a second order that reiterated that the parties (the plaintiff and his wife) were both ordered to refrain from molesting, harassing, or annoying the other party and reaffirmed the responsibility of all law enforcement officers to enforce the restraining order and to take the offending party into custody, if there was probable cause to believe a violation had occurred, and to bring that party "immediately" before "this Court" to show cause why said party should not be held in contempt for violating the order. (Ex. 4, Docket No. 52). This order also provided that Mrs. Blumel would be granted temporary use of the plaintiff's Izuzu pick-up truck, which was still registered in his name. (Docket No. 52, pg. 74 and Ex. 4). Mrs. Blumel was instructed to provide proper insurance coverage on the vehicle.

The arrest of the plaintiff occurred on November 9, 1992. The plaintiff states that, on that date, he thought he saw his estranged wife on the side of the road beside a broken down vehicle, which was not the same

Izuzu truck the state court had granted over to Mrs. Blumel. He drove back and forth along the road approximately five (5) times to take pictures of the person he thought was his estranged wife. He felt that he could use the photographs to convince the state court judge to return the Izuzu pick-up truck to his possession by proving she had another vehicle at her disposal (Docket No. 52, pgs. 80–82 and 98). According to him, Mr. Blumel never stopped, but just drove by at ten (10) to fifteen (15) miles per hour taking pictures (Docket No. 52, pgs. 88–98). He then headed away from the scene and went toward Brooksville. (Docket No. 52, pg. 98). The testimony of the plaintiff in this regard is uncontroverted.

After making other stops in Brooksville, the plaintiff stopped at the Gator Store, which is approximately ten (10) miles from the scene described in the above paragraph to make a telephone call. This was probably one (1) to two (2) hours after the fact. The plaintiff was arrested at that store by Deputy Sheriff Erickson, in the parking lot as he was starting to drive away (Docket No. 52, pg. 104, 106–107). The plaintiff was read his *Miranda* rights, hand-cuffed, and transported in a marked patrol car to the Hernando County Sheriff's Department, where he was left in the patrol car while the deputy was inside for approximately one-half (½) hour (Docket No. 52, pg. 108). Thereafter, Blumel was taken to the Hernando County Jail where he was booked and allowed to telephone a friend to have his vehicle picked up and returned home. He either called his daughter to contact his attorney, Mr. Huffstetler, to inform the lawyer he was in jail, or asked his friend to call the daughter (Docket No. 52, pgs. 109–110 & 167).

The plaintiff made a first appearance in front of Hernando County Judge Hyslop on November 10, 1992. No bond or other condition of release was set by the judge (Docket No. 52, pgs. 112–115). Prior to the hearing, Judge Hyslop sent his judicial assistant to Judge Tombrink's office with a note asking for a hearing date on the contempt charge. The return from Judge Tombrink failed to provide any hearing information. But Judge Hyslop stated: "While I did not receive the

hearing date I had requested, I believed that Mr. Blumel still would be taken to see Judge Tombrink immediately, because the restraining order directed the arresting law enforcement officer to bring Mr. Blumel 'forthwith' before Judge Tombrink 'to show cause why he [Mr. Blumel] should not be held in contempt.'"

The essence of that first appearance is set forth as follows:

Judge Hyslop: Let's see. Mr. Blumel, you're in on a civil charge of contempt of court. You're not charged with any crime. Do you understand that it's not a crime that's holding you there but an allegation that you violated a restraining order?

Blumel: Yes sir.

Judge Hyslop: Okay. And are you able to hire an attorney to represent you in a hearing on that or are you going to need me to appoint you one?

Blumel: I'll use the same one I used for the divorce, sir.

Judge Hyslop: And who was that?

Blumel: Mr. Huffstetler.

Judge Hyslop: Okay. You're going to be hiring him yourself?

Blumel: Yes sir.

Judge Hyslop: Okay, good enough. Thank you sir. There's no bond available on that until the hearing's held to determine if you did in fact come into contempt of court. You need to contact Mr. Huffstetler as soon as you can and let him know you're there, and try to get that scheduled, okay?

Blumel: So I'm ... I'm stuck here, right?

Judge Hyslop: You're stuck there until further order from Judge Tombrink. I'm here only to see if you needed a public attorney appointed to represent you.

Blumel: Okay.

Judge Hyslop: Okay?

Blumel: Thank you.

Judge Hyslop: Thank you sir.

(Docket No. 48, pgs. 6–7)

The plaintiff attempted to contact Mr. Huffstetler from the jail that day or the next but his call was refused by the office (Docket No. 52. pg. 115). The plaintiff then called his daughter and asked her to notify Mr. Huffs-

tetler, but the plaintiff did not actually talk to Mr. Huffstetler until about December 10, 1992, when he was taken before Judge Tombrink (Docket No. 52, pg. 116).

It is the plaintiff's recollection that he always asked his daughter why it was taking so long to get a hearing. Blumel's daughter told him she kept asking Mr. Huffstetler's office the same question and they told her that they were working on Mr. Blumel's case (Docket No. 52, pg. 123). Mr. Blumel's son, Thomas Blumel, Jr., wrote Mr. Huffstetler on November 19, 1992, inquiring about his father's case and confinement (Exs. 4–5, Docket No. 51).

Mr. Huffstetler sent a private investigator to the jail, about November 23 or 24, and the plaintiff spoke to him for about five (5) minutes (Docket No. 52, pg. 127–128). The investigator told the plaintiff that it was taking so long because his arrest paperwork had been lost at the jail or the courthouse and that Mr. Huffstetler was working on setting a hearing (Docket No. 52, pg. 129).

The plaintiff also recalls asking the jail personnel when he was going to be taken before Judge Tombrink and for copies of paperwork he felt he should have been given at the time of the initial appearance (Docket No. 52, pg. 173).

A notice of hearing issued from Judge Tombrink setting a contempt hearing for Mr. Blumel on December 10, 1992. The notice is dated as entered on December 9, 1992 (Ex. 3, Docket No. 51). This notice was apparently received by Mr. Huffstetler in the normal course of business (Docket No. 51, pgs. 8–9).

On December 9, 1992, the plaintiff states he was taken to the booking area and "re-arrested" on aggravated stalking charges and those were also charges he appeared for on the 10th before Judge Hyslop (Docket No. 52, pg. 118; Docket No. 49).[2] When he appeared before the judge, bond was set at $5,000.00, but reduced the next day to $1,000.00, and the contempt charge was dismissed for lack of evidence (Docket No. 49). Later, the aggravated stalking charge was

dropped also after his ex-wife signed a waiver of prosecution (Docket No. 52, pgs. 119 and 211).

In 1992, generally the restraining order directed the sheriff to bring the alleged violator before the judge forthwith, so there was usually a rapid hearing (Docket No. 51, pg. 5). In Attorney Huffstetler's experience that meant a hearing within two (2) to three (3) days (Docket No. 51, pg. 31). At that time, the issuing judge has on-going authority to find the alleged violator in contempt of court (Docket No. 51, pgs. 5–6). The practice in Hernando County at that time was for the court to schedule the hearing not the attorney, according to Mr. Blumel's attorney at that time, although he admitted he could have called and tried to set a hearing if he thought the client had been in jail too long without a hearing (Docket No. 51, pgs. 10, 23 and 37).

Lawrence T. Brown was the warden of the Hernando County Jail in November/December 1992, a position appointed by the County. The jail was run by CCA pursuant to contract (Docket No. 50, pgs. 6–7). The County concedes in their interrogatories that policy for the County jail was set by CCA (Ex. N, Docket No. 63). Warden Brown stated that he implemented changes in policy based on current state law, rules and regulations of the state jail inspector, company policy, court mandate, and the American Correctional Association (ACA) guidelines and standards. He was the only one with the authority to implement policy changes for the jail facility (Docket No. 50, pgs. 10–11).

In 1992, Mr. Brown reported directly to his "vice-president", David Myers, vice-president of operations, with CCA (Docket No. 50, pgs. 8 and 12). Policy directives were promulgated through Linda Cooper, the vice-president of legal affairs (Docket No. 50, pg. 13). There was also a County contract monitor who computed gain time and release dates and monitored other contract aspects, i.e. billing (Docket No. 50, pg. 14). The contract, at section 12, stated in this regard:

---

2. The capias for the aggravated stalking charges was issued on November 25, 1992, but the plaintiff was not arrested until December 9, 1992, at

12:30 p.m., according to the arrest affidavit/first appearance form for those charges (Docket No. 49).

The COUNTY shall appoint a Contract Monitor who shall be responsible for documenting adherence to the Contract and compliance with the rules, policies, procedures, and performance standards applicable thereto. The Contract Monitor shall be the official liaison between the COUNTY and the CCA and, as such, shall have access, at all reasonable times, to all areas of the Jail. (Ex. 1, Docket No. 50)

The contract monitor was supervised by the county administrator, then Mr. Hetrick (Docket No. 50, pgs. 16–17).

CCA follows the ACA standards for training for adult local detention facilities, third edition (Docket No. 50, pg. 73). The training standards for correctional officers require that all new correctional officers receive 40 hours of training prior to entry on duty, an additional 120 hours of training during the first year and an additional 40 hours of training each following year of employment. At a minimum, the training must include training various areas; as relevant here that is supervision of inmates, inmate rules and regulations, and rights and responsibilities of inmates. (Ex. 10, Docket No. 50).

It is Warden Brown's position that, in 1992 and now, the only appropriate authorities that can and could have given written direction for the incarceration of an individual in the Hernando County Jail are/were the "court, Circuit Court Clerk's office, and the county monitor. And in some cases, the State Attorney ... A deputy sheriff unarresting a person." (Docket No. 50, pgs. 24 and 26). Further, the warden believed that only the courts, the county clerk, and various other agencies have/had the authority to release inmates from the jail (Docket No. 50, pg. 17). The jail "accepts" an arrest affidavit from law enforcement (but on a warrantless arrest would not accept an inmate without the arrest affidavit), a bondsman bringing in a bond violation, parole officer on violation of parole, and warrants in order to initially process an inmate (Docket No. 50, pgs. 27 and 65).

With regard to releasing an inmate, CCA required/requires a judge's order, an "unarrest" by a law enforcement officer, or permission from a probation officer or the county contract monitor on the gain time calculations (Docket No. 50, pg. 28). At the Hernando County Jail, the records clerk is responsible for determining whether there is probable cause to continue to detain inmates arrested without a warrant (Docket No. 50, 61).

Warden Brown stated that, in November and December 1992, it was his understanding that "a warrantless arrestee was entitled to judicial, a prompt judicial determination of probable cause to continue to detain that individual." (Docket 50, pg. 42). In fact, the warden stated that a jail could hold someone arrested without a warrant for only twenty-four (24) hours before judicial determination of probable cause, unless a catastrophe happened. He based his statement on his understanding of Florida law (Docket No. 50, pg. 43). The Hernando County Jail procedures did not change in the light of the *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), because, according to Warden Brown, the Florida law already required a twenty-four (24) hour determination. Warden Brown asserts that the first appearance "is a determination of whether there's probable cause or not ... You determine whether he needs a lawyer, whether the arrest was good, and whether he needs to stay in jail" (Docket No. 50, pg. 56).

Warden Brown asserts that Mr. Blumel had received a judicial determination of probable cause. This assertion, he stated, was based on Exhibit 4 to his deposition, a copy of a document denominated "FIRST APPEARANCE FINDINGS & ORDERS". This Court notes that said document is incomplete and not signed by any judge. The document demonstrates only that: 1) Mr. Blumel appeared before the court (no indication of which judge) at 1:30 p.m. on November 10, 1992; that he refused appointment of counsel; and that he agreed to appear for court on December 9, 1992 at 9:30 a.m. In fact, Warden Brown stated as to that hearing:

[T]his is a first appearance hearing, and if a judge is going to turn him loose, he'll turn him loose at first appearance. And if he don't rule anything, we hold him until

he meets his court date ... (Docket No. 50, pg. 45).

This position is supported by the CCA's answer to plaintiff's first set of interrogatories, interrogatory no. 5:

> 5. Do you contend that Plaintiff was not entitled to a prompt judicial determination of probable cause to detain him following his warrantless arrest? If so, please state the basis for such contention.
>
> Yes. According to the judge presiding at Plaintiff's first appearance, Plaintiff was arrested on a civil contempt charge. The arrest was made by a sheriff's deputy relying on an order previously issued by Hernando County Circuit Court Judge Richard Tombrink. Under such circumstances, a probable cause determination was not necessary. (Docket No. 49, pg. 5 of attachment 2).

The Hernando County Jail has a classification committee that reviews each inmate every week to make certain he or she is legally incarcerated. The members of the committee include the deputy warden, the chief superior, the nurse, the program director, the classification officer, and several unit managers (Docket No. 50, pgs. 86–87). The committee also discusses housing, medical needs, diets, work, discipline, and incarceration (Docket No. 50, pg. 88).

The plaintiff was processed into the jail pursuant to the deputy sheriff's probable cause affidavit (Ex. 5, Docket No. 50). According to Warden Brown, CCA relied on the initial appearance to continue to hold the plaintiff after forty-eight (48) hours, in that no written directive for release was given by the Court at that time (Docket No. 50, pg. 30). On December 11, 1992, Plaintiff was finally released from jail on bond (Docket No. 50, pg. 34).

### DISCUSSION

As this Court stated in its order on motion to dismiss, *Blumel v. Mylander,* 919 F.Supp. 423, 426 (M.D.Fla.1996):

> A person arrested and detained without a warrant has a constitutional right to have a judicial officer determine probable cause

within the first forty-eight (48) hours. (cite omitted) ...

In this case, Plaintiff claims that both CCA and the County violated this constitutional right, and, therefore, brings this action under Section 1983. As discussed below, the Court concludes that there are no genuine issues of fact remaining to be resolved, absent damages, and that Mr. Blumel is entitled to a judgment as to both defendants' liability as a matter of law. The Court will address the issues raised by the parties topically.

### ELEMENTS OF SECTION 1983

In determining whether or not the defendants are liable under Section 1983, the Court has stated the following in its previously cited order on motion to dismiss:

> To impose Section 1983 liability on a [local government] actor for failing to act to preserve a constitutional right, a plaintiff must establish: (1) that he possessed a constitutional right which was deprived; (2) that the defendant had a policy or custom; (3) that the policy or custom constituted a deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the deprivation. (cites omitted).

919 F.Supp. at 426.

■ I. As to the first element, Plaintiff clearly possessed a constitutional right to have a judicial determination, that probable cause existed for his continued detention, within the first forty-eight (48) hours after his arrest. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (holding that "the Fourth Amendment requires a [prompt] judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest"); *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (requiring a judicial determination of probable cause within forty-eight (48) hours of the warrantless arrest, absent extraordinary circumstances); *Powell v. Nevada,* 511 U.S. 79, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) (deeming a four (4) day delay in the defendant's probable cause determination as "presumptively unreasonable under *McLaughlin*'s 48–hour rule)." The defendants first argue that this

constitutional right does not apply to Mr. Blumel because they allege he was not a criminal defendant. Rather, they assert that the plaintiff was merely in civil contempt of court and had no right to a probable cause determination.

■ The Court rejects the defendants' argument and concludes that Plaintiff was arrested for indirect criminal contempt of court. In *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court of the United States analyzed the differences between indirect civil and indirect criminal contempt of court. Distinguishing between the two (2) types of contempt is important because the Constitution requires more procedural due process protections to the criminal contemnor. Sanctions imposed under civil contempt of court are usually purgable by the contemnor, in that, he "carries the key to the prison in his own pocket", i.e. his detention is contingent on his obeying a specific court directive, such as the release of the name of a source for an incarcerated journalist. *Id.* at 828–30, 114 S.Ct. at 2558. By contrast, incarceration imposed under criminal contempt is not purgable because it is designed to punish a "completed act of disobedience" of a court order. *Id.* The fact that a judge may label the "contempt" in question as civil is not dispositive of the issue. Rather, one must examine the "character of the relief itself." *Id.* at 828, 114 S.Ct. at 2557. Looking at the characteristics of Mr. Blumel's situation, the Court respectfully disagrees with Judge Hyslop's denomination of Mr. Blumel's situation as civil contempt.

The plaintiff was arrested by the law enforcement officer based on that officer's conclusion that the plaintiff had taken actions which were in violation of the previously issued restraining order. In other words, the officer concluded that the plaintiff had "completed [an] act of disobedience" of a court order. Clearly, the plaintiff did not "carry the key to the prison"—only the issuing judge carried that key for this individual. Mr. Blumel could not purge himself of the contempt through any action.

Furthermore, some of the procedures utilized in this instance closely resemble the indirect criminal contempt procedures set forth in the Florida Rules of Criminal Procedure, Rule 3.840. Similar to the order to show cause requirement of Rule 3.840(a), Judge Tombrink's restraining order provided for law enforcement to bring Mr. Blumel immediately before "this Court," to show cause why he should not be held in contempt of court, upon a determination by law enforcement that probable cause existed to believe that Mr. Blumel had violated the restraining order. Examination of relevant Florida case law also reinforces this Court's conclusion that the plaintiff was arrested for indirect criminal contempt of court. *Pugliese v. Pugliese*, 347 So.2d 422 (Fla.1977); *Landingham v. Landingham*, 685 So.2d 946 (Fla. 1st D.C.A.1996); *Hipschman v. Cochran*, 683 So.2d 209 (Fla. 4th D.C.A.1996).

Because the Court concludes that Plaintiff was arrested for indirect criminal contempt of court, it is indisputable that the plaintiff was entitled to prompt judicial determination of probable cause for his continued detention, as set forth in *Gerstein* and its prodigy. *Bagwell*, 512 U.S. at 824–28, 114 S.Ct. at 2556–57. However, even if the plaintiff had been arrested for civil contempt of court, this Court's conclusion that he possessed this constitutional right would not change. The holding of *Gerstein*, on its face, applies to any "extended restraint of liberty following arrest." 420 U.S. at 114, 95 S.Ct. at 863; *cf. Soldal v. Cook County, Illinois*, 506 U.S. 56, 65–67, 113 S.Ct. 538, 546, 121 L.Ed.2d 450 (1992) (applying the Fourth Amendment protection against unreasonable searches and seizures in a civil case). Therefore, regardless of the reason behind the plaintiff's warrantless arrest, he was entitled to the requisite probable cause determination because his liberty was extensively restrained by the defendants. The defendants simply cannot hide behind some label in order to defeat this plaintiff's basic constitutional right.

■ Having concluded that the plaintiff possessed a constitutional right, the Court readily determines that this right was deprived. Mr. Blumel was detained for thirty (30) days, a full twenty-eight (28) days past

the point in time at which he was **constitutionally entitled** to a judicial determination of probable cause for that lengthy incarceration. **MAKE NO MISTAKE ABOUT IT; MR. BLUMEL'S LIBERTY WAS INFRINGED WITHOUT DUE PROCESS!**

■ II. The second element requires the plaintiff to prove that each of the defendants possessed a policy or custom. As to defendant CCA, the Court concludes its conduct in relation to the plaintiff was pursuant to an existing policy. The deposition of Warden Brown readily supports the Court's finding that, at all relevant times, he possessed final policy making authority for CCA and, consequently, the County (as discussed below). *See Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (stating that "the authority to make municipal policy is necessarily the authority to make final policy"). In fact, Warden Brown stated:

Question: Okay. Is it fair to say that you are the individual who implements any changes in the Hernando County jail policy that are required by federal or state law or the contract or the American Correctional Association standards?

Answer: Yes.

Question: Okay. Did anyone else have the authority to implement such changes?

Answer: No.

(Docket No. 50, pg. 10).

Given that Warden Brown is the official policymaker for CCA, the Court determines that CCA's relevant policy was to release an inmate only if it had a judge's order, an "unarrest" decision by a law enforcement officer, the decision of a probation officer, or by the direction of the county contract monitor in regard to gain time calculations (Docket No. 50, pg. 28). Even though clearly having knowledge of the *McLaughlin* decision (Docket No. 50, pg. 56), CCA asserts that its responsibility ends with taking the inmate before a judge for an initial appearance. In fact, CCA/Warden Brown's policy is that if, at the first appearance, the judge fails to "rule anything" or to turn the inmate loose, the inmate remains incarcerated until the next scheduled court date (Docket No. 50, pg. 45). In other words, unless it receives instruction from those few people it purports to be authority for release, CCA's policy is to hold inmates indefinitely—even though there has never been an actual judicial determination of probable cause within forty-eight (48) hours of the arrest.

The Court easily rejects CCA's argument that its policy is lawful because it lacks the independent, contractual authority to release inmates on its own initiative. As a state actor, *see* 919 F.Supp. at 426–27, CCA could not plausibly convince the Court that it was powerless to obey the Constitution. Constitutional duties trump contractual limitations!

■ As to the defendant, Hernando County, the Court concludes that it followed the same policy as CCA. Although the County asserts that it never established a policy or ordered CCA to violate the constitutional rights of inmates, the Court must reject that argument. The County attempts to avoid liability in this case by relying on its contract with CCA, in that it claims only to have authorized those policies of CCA that complied with constitutional requirements and state and federal laws. However, clearly, the County could not contract away or otherwise delegate its constitutional duties. *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700 (11th Cir.1985) (concluding that a county's obligation to provide medical care to incarcerated individuals cannot be delegated to a private corporation). At the time of the contract, the County knew that CCA would be performing the County's public function which necessarily implicates adherence to constitutional doctrines. *See* 919 F.Supp. at 426–27. Unless it chose to retain final policymaking authority, the County could only rely on·CCA's interpretation of constitutional law in its formulation of policy. Indeed, the County concedes in their interrogatories that policy for the County jail was set by CCA (Ex. N, Docket No. 63). Therefore, CCA policy is the policy of the County; at all relevant times, the defendants' agents acted in conformance with this policy.

III. The next element requires proof that the policy constituted deliberate indifference

to the plaintiff's constitutional rights. In this case, the plaintiff seeks to prove this deliberate indifference under three (3) theories: 1) the defendants' policy failed to comply with *Gerstein*, et al.; 2) the defendants' policy was inadequate; and 3) the defendants failed to train their agents on the law of *Gerstein*, et al. These theoretical distinctions, while creative, are really nothing more than three (3) sides of the same coin. Basically, Plaintiff must prove that the defendants' policy reflected a deliberate indifference to his *Gerstein*, et al., rights.

■ The Court concludes that the defendants' policy was deliberately indifferent to the plaintiff's constitutional right. The Supreme Court analyzes "deliberate indifference" under the "obviousness" test. *Farmer v. Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994). This test is an objective one, *id.*, in that it focuses on whether the inadequacies of the policy in question are "so likely to result in the violation of constitutional rights, that the policymakers of the [local government] can reasonably said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).

Accordingly to the undisputed facts of this case, Warden Brown interpreted a Florida Criminal Procedure Rule, albeit somewhat erroneously,[3] to require that an inmate arrested without a warrant *must* be brought before a judicial officer for a probable cause determination within twenty-four (24) hours of arrest, barring a catastrophe (Docket No. 50, pg. 43). He further thought this rule to be more restrictive than *Gerstein*, et al. In fact, Warden Brown stated that there was no need to change jail procedure and policy in light of the *McLaughlin* decision, because he was of the opinion that the Florida law required a hearing within twenty-four (24) hours to determine probable cause (Docket No. 50, pg. 56). Thus, at a minimum, the defendants were "conscious" of their constitutional duty. *Harris*, 489 U.S. at 389, 109 S.Ct. at 1205.

Given that the defendants were actually and constructively aware of the forty-eight (48) hour probable cause requirement, the only logical conclusion is that this policy—refusing to release an inmate without an "order" from one of the "authorities" CCA recognizes—is blatantly and obviously inadequate. Extension of the defendants' policy to a worst case scenario would strongly suggest that the plaintiff might well still be in jail today barring outside intervention.

CCA attempts to disavow that it has any duty to release inmates without direction from an "authority." However, this interpretation of their duty would disembowel the rights of a warrantless detainee as recognized in *Gerstein*, et al. The defendants are the custodians of the plaintiff and similarly situated individuals. As such, they are charged with the responsibility to ensure that such persons are brought before a judicial officer within the first forty-eight (48) hours of arrest for a determination of probable cause, in compliance with the Fourth and Fourteenth Amendments, *Gerstein*, *McLaughlin*, and Fla.R.Crim.P. 3.133. Absent such a timely determination, such persons must be released—even on the jailer's own initiative—to be in compliance with the well-established law of the land. *Bernard v. City of Palo Alto*, 699 F.2d 1023, 1027 (9th Cir.1983) (rejecting the county jailkeeper's argument that it should not be held liable for an inmate's delayed probable cause hearing, reasoning that "[t]he County is responsible for operating the jail and has custody over arrestees.... [and] [b]y virtue of its power to release arrestees unconstitutionally detained, the County is in a position to protect the fourth amendment rights of arrestees"); *see also Wayland v. City of Springdale*, 933 F.2d 668, 670 (8th Cir.1991) (emphasizing that the custodian of the plaintiff, the police, "[c]ertainly ... could not have held [the plaintiff] indefinitely waiting for an arraignment sometime in the future").

■ IV. As to the final element, causation, the Court concludes that there is no

---

**3.** The actual rules require that the inmate have an initial appearance within twenty-four (24) hours and a probable cause determination within forty-eight (48) hours. Fla.R.Crim.P. 3.130 & 3.133.

genuine issue of fact as to whether the defendants' policy was the "moving force" behind the deprivation of the plaintiff's constitutional right to a prompt judicial determination of probable cause. Had the defendants acted under a proper policy (see above), the plaintiff would have been timely released because no judicial officer found probable cause to detain him past the initial forty-eight (48) hours. Alternatively, if the defendants had ensured that the plaintiff received a prompt probable cause determination, he would have been timely (1) released, (2) released on reasonable conditions, or (3) constitutionally detained.

In this regard, the Court is persuaded by the highly analogous case of *Lambert v. McFarland,* 612 F.Supp. 1252 (N.D.Ga.1984). In *Lambert,* the plaintiff and other persons were arrested by the city police, acting without a warrant, on drug and disorderly conduct charges. Two (2) days after his arrest, the plaintiff was brought before a municipal court judge for an initial hearing. Although the judge set bail, he declined to determine probable cause because the arresting officer failed to appear. Also, one of the plaintiff's co-defendants requested a lab analysis of the alleged drugs. Therefore, the judge continued the probable cause determination. Indigent and unable to make bond, the plaintiff was detained in the city jail for nearly six (6) weeks awaiting this probable cause hearing. He was ultimately released after the municipal court dismissed the charges for insufficient evidence.

Among other parties, the city was sued by the plaintiff under Section 1983. Moving for partial summary judgment, the plaintiff argued that his liberty was deprived without due process in violation of *Gerstein.*[4] After permitting the parties to conduct additional discovery, the *Lambert* court found the city liable as a matter of law. Deeming the city to be "the responsible custodian of those confined in ... the [j]ail," the Court held that the city caused the plaintiff's injury because it was "the policy and practice of [the city] to detain people who have not received a prompt determination of probable cause after a warrantless arrest." *Id.* at

1269, 1262 (respectively); *see also id.* at 1262 n. 4.

The *Lambert* court specifically rejected the city's argument that the plaintiff was responsible for his delayed detention, in that he "did not request a preliminary hearing at any time," stating that "there clearly [was] no way that plaintiff could have obtained his own release from the unconstitutional detention at the ... [j]ail. That prerogative lay solely with the jail-keepers." *Id.* at 1265. Accordingly, the court granted the plaintiff's motion for partial summary judgment.

Just as the jailer in *Lambert* had a policy of detaining persons who had not received the requisite probable cause determination, CCA refused to release the plaintiff on its own initiative despite the absence of any prompt judicial determination of probable cause. In fact, CCA's policy is the functional, if not the exact, equivalent of the jailer's policy in *Lambert.* Thus, the causal link between the defendants' policy and Blumel's injury is at least as sufficient as the causal link in *Lambert.*

The Court also finds instructive the *Lambert* court's rejection of the jailer's reliance on the plaintiff's failure to request a probable cause determination. Indeed, both the *Lambert* jailer and CCA had the sole "prerogative" to release Lambert and Blumel, respectively, before their detention exceeded the bounds of *Gerstein,* et al. Furthermore, Judge Hyslop's failure to determine probable cause at the first appearance is just as irrelevant in this case as the municipal court judge's delaying a determination of probable cause was in *Lambert.* Therefore, similarly situated as the jailer in *Lambert,* the defendants in this case are the "responsible custodians" of Blumel.

As to one (1) of the defendants' causation arguments, the Court easily rejects the contention that the plaintiff has not carried his summary judgment burden with regard to this element. According to Warden Brown, the jail did not release any arrestee without being told to do so by one of its recognized "authorities." The only reasonable inference that can be drawn from his deposition testi-

---

**4.** The *Lambert* case was decided prior to *McLaughlin.*

mony is that, had the jail acted under a proper policy that recognized its duty to release those inmates detained without the requisite *Gerstein*, et. al, procedural protections, the plaintiff's liberty would not have been unconstitutionally detained.

The defendants also contend that the plaintiff has failed to show that, had he been given a prompt probable cause hearing, he would been released on bail or other conditions. However, this argument is not well taken. It is the plaintiff's right to a probable cause determination that was unconstitutionally deprived, not his right to liberty. Had the defendants ensured that the plaintiff received the requisite probable cause determination and the presiding judicial officer found probable cause for his continued detention, then the ensuing restraint of the plaintiff's liberty would have been permissible.

Finally, in this case, the fact that the plaintiff's deprivation may have been a "single incident of unconstitutional activity" is insufficient to relieve the defendants of liability. Rather, as the Court has concluded, the plaintiff's deprivation "was caused by an existing, unconstitutional ... policy, which policy can be attributed to" the defendants. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Similarly, the alleged uniqueness of the plaintiff's situation is no excuse for the defendants' inadequate policy. *Trezevant v. City of Tampa*, 741 F.2d 336, 339 (11th Cir. 1984).

### DAMAGES AS A PROPER REMEDY FOR GERSTEIN VIOLATION

■ CCA argues that neither *Gerstein* nor *McLaughlin* specifically endorse civil liability as a remedy for a jailer's violation of the Fourth and Fourteenth Amendments. The Court, however, is not persuaded by that position. Neither of those cases involved a claim for damages. Rather, relevant case law from the United States Court of Appeals for the Eleventh Circuit supports this Court's conclusion that a plaintiff can recover compensatory damages for a *Gerstein* violation just like any other civil rights violation. *E.g., Rivas v. Freeman*, 940 F.2d 1491 (11th Cir.1991) (upholding a district court's awarding of $100,000 against a sheriff for his "lack

of well-established policies and procedures," which "caused [the plaintiff's] arrest, his unnecessary six-day incarceration, and his resulting humiliation").

### AFFIRMATIVE DEFENSE OF PROBABLE CAUSE

■ To defeat the plaintiff's Section 1983 claim, the defendants advance the affirmative defense of probable cause. However, they advance no relevant legal support for this defense. The Court concludes that it is without merit. Any retroactive finding by this Court or a jury as to probable cause to detain the plaintiff past the first forty-eight (48) hours would not cleanse the defendants' unconstitutional conduct. The plaintiff possessed a right to have a judicial officer determine probable cause within the first forty-eight (48) hours after his arrest—not within the first four (4) years after his arrest! For similar reasons, the Court respectfully finds no relevance in Judge Hyslop's after-the-fact finding of probable cause (Affidavit, Docket No. 49). If Judge Hyslop truly believed that there was probable cause to continue to detain the plaintiff, such a finding is completely absent from the record of the first appearance hearing. Any silent determination of probable cause by the judge fails to satisfy *Gerstein*, et al. Indeed, County Judge Hyslop believed that the plaintiff would go immediately before Circuit Judge Tombrink, as the restraining order provides.

### EMERGENCY/EXTRAORDINARY CIRCUMSTANCES

Although not alleged in their answers, the defendants contend that any *Gerstein/McLaughlin* violation on their part is excusable because the circumstances surrounding the plaintiff's detention were extraordinary or constituted an emergency. However, this bare assertion completely lacks factual or legal support. The Court fails to understand how an arrest for contempt of court, whether indirect criminal or civil, could be considered extraordinary. Unfortunately, it is not uncommon for parties to disobey court orders. Furthermore, as the Court explained *supra*, the alleged uniqueness of the plaintiff's situation is no excuse

for an constitutionally-insufficient policy. Therefore, the Court rejects the defendants' hollow emergency/extraordinary circumstances argument.

## QUALIFIED IMMUNITY

CCA advances the affirmative defense of qualified immunity in its amended answer. As a matter of law, the Court holds that this defense is not available to CCA. The affirmative defense of qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Williams v. Alabama State University*, 102 F.3d 1179 (11th Cir. 1997).

■ First, the Court concludes that CCA is not entitled to qualified immunity because it is not a "government official." Rather, as the Court emphasized in a previous order, CCA may be sued as a state actor under Section 1983 because it is performing a public function. 919 F.Supp. at 426–27. Indeed, CCA concedes that it is a proper Section 1983 defendant (Docket No. 48, p. 10). Because CCA is performing a public function pursuant to a contract, it is essentially stepping in the shoes of the County. Therefore, suing CCA is tantamount to suing a political subdivision of the state, not a government official in his or her individual capacity.

CCA's reliance on *Smith v. United States*, 850 F.Supp. 984 (M.D.Fla.1994) (Sharp, J.), is misplaced. In *Smith*, the federal government contracted with the defendant-corporation to operate an Orange County, Florida, halfway house. Certain inmates of the halfway house sued the federal government and the defendant-corporation, among others, for violating their equal protection rights and for subjecting them to cruel and unusual punishment. In its answer, the defendant-corporation raised qualified immunity as an affirmative defense.

At the motion to dismiss stage, the district court allowed the defendant-corporation to raise qualified immunity, concluding that "a private corporation under contract with the government to perform a public service is entitled to raise qualified immunity as a defense." *Id.* at 986. However, at the summary judgment stage, the district court apparently departed from its prior holding because it held that the defendant-corporation was ineligible for qualified immunity. 896 F.Supp. 1183, 1189 (M.D.Fla.1995). The Court reasoned that the defendant-corporation "should be considered a governmental entity, and not an individual government actor." *Id.*

Because of the apparent contradiction between the district court's holdings, this Court refuses to extend *Smith* beyond the facts of that case. Even if Court were to extend *Smith* to the instant case, it would choose to follow the *Smith* court's summary judgment analysis over its motion to dismiss analysis. The Court simply does not agree with the *Smith* court's policy reasons in its motion to dismiss order that "unlike a municipal corporation, a private corporation is not expected to bear the cost of government and ... the risk of liability would deter private corporations from contracting with the government." 850 F.Supp. at 986.

■ Rather, the Court believes that, because CCA knowingly performed a public function for which it was compensated, it is entirely reasonable and expected that CCA bear the costs associated with managing the County's jail. Therefore, this Court holds that a private corporation which contracts with a local government to perform a public function is not entitled to raise the affirmative defense of qualified immunity in a Section 1983 case. Parties such as CCA should be treated as local government entities as opposed to government officials sued in their individual capacities.

Even if CCA were entitled to raise the affirmative defense of qualified immunity, its policy, on its face, violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 817–18, 102 S.Ct. at 2738. In *Williams*, the court stated:

> For a constitutional right to be clearly established so that qualified immunity does

not apply, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (citation omitted). 102 F.3d 1179, 1182 (11th Cir.1997).

At the time of the plaintiff's arrest and incarceration, the contours of *Gerstein,* et al., were sufficiently, if not entirely, clear to put the defendants on notice that their policy and conforming conduct were in violation of the plaintiff's right to a prompt probable cause determination. In fact, Warden Brown specifically admits his awareness of the *McLaughlin* decision and its comparison to the Florida Rules of Criminal Procedure (Docket No. 50, pgs. 42 & 56).

By his own testimony, the warden apparently did not feel that the jail had the burden of complying with the requirements of those cases. However, if the *Gerstein* and *McLaughlin* decisions are to have any meaningful application to persons such as the plaintiff, jailers must ensure that they receive the requisite probable cause determination in a timely manner or else jailers must release them on their own initiative. If an inmate is lost in the system, as the plaintiff seemingly was, who is in the best position to safeguard the inmate's rights? Certainly, the people overseeing his incarceration are in that position. They have knowledge of the facts surrounding the incarceration not necessarily known to the court, its officers, and the law enforcement community, at large.

*JUDICIAL IMMUNITY*

Finally, the defendants contend that they are immune from suit on the theory that they were simply executing an "oral order" of commitment issued by Judge Hyslop at the first appearance hearing. As such, they insist that they share Judge Hyslop's right to absolute immunity when performing judicial functions. However, based upon the undisputed facts, Judge Hyslop never entered any order of commitment, oral or written.

The defendants' reliance on the judge's statement that the plaintiff was "stuck ... until further order from Judge Tombrink" is misplaced. First, Judge Hyslop himself did not consider his statement to be an order of commitment. The judge attested, without contradiction by the defendants, that he "... believed that Mr. Blumel still would be taken to see Judge Tombrink immediately, because the restraining order directed the arresting law enforcement officer to bring Mr. Blumel 'forthwith' before Judge Tombrink" (Docket No. 52). Also, there is nothing in the judge's statement that even resembles an order of court. In fact, the failure of the defendants to ensure that the plaintiff be brought immediately before Judge Tombrink violated a validly issued written, unambiguous, order from Judge Tombrink.

Given the Court's finding that there was no order of commitment, the cases cited by the defendants are not applicable. *U.S. ex rel. Bailey v. Askew,* 486 F.2d 134 (5th Cir. 1973) (stating that "a jailer cannot be held liable for an error in an *order of commitment* which is patently proper") (emphasis added); *Tucker v. City of Montgomery Bd. of Com'rs,* 410 F.Supp. 494 (M.D.Ala.1976) (involving a warden of a city jail who "accepted plaintiffs for incarceration pursuant to *judicial orders of commitment* ") (emphasis added); *State of La. ex rel. Purkey v. Ciolino,* 393 F.Supp. 102 (E.D.La.1975) (deeming a § 1983 claim against the warden of a state prison as "frivolous" because "prison wardens are immune from ... damages for merely asserting custody over a prisoner pursuant to a *valid commitment order* ") (emphasis added).

*STATE LAW CLAIMS AND OTHER PENDING MATTERS*

With regard to any Section 1983 arguments not specifically resolved above, the Court rejects them as being without merit without further discussion.

With regard to Plaintiff's false imprisonment and negligence state law claims against both defendants and the defendants' corresponding motions for summary judgment, the Court dismisses all state claims. This Court has found liability on the Section 1983 claims and will be setting a trial on the only remaining triable issue in the case, damages. Pursuing the state law claims would be duplicitous on the issue of liability. On the issue of damages, the plaintiff is not entitled to overlapping damages nor has he demonstrated that the damages under the state law claims are somehow unique and separate

from the damages under the Section 1983 claim. Therefore, the state law claims are rendered moot, until or unless the finding of liability on the Section 1983 claim is reversed. Accordingly, it is

**ORDERED** that the plaintiff's renewed motion for partial summary judgment (Docket No. 63) be **granted;** the defendants' motions for summary judgment (Docket Nos. 48 and 65) be **denied;** the Clerk of the Court be **directed** to enter judgment on liability in favor of the plaintiff and against the defendants, Hernando County and Corrections Corporation of America, as to Count I and to dismiss Counts II through V as moot; and the parties be **advised** that the only remaining triable issue is the matter of amount of damages; and that issue will be scheduled for trial pursuant to the order dated December 11, 1996 (Docket No. 71).

